**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JAMES E. TEMPLETON,**

      **Plaintiff,**

**v.**                              **Case No.:  3:13-cv-06577**

**MISTY BENNETT, Administrator of
PRIME CARE MEDICAL INC.;
LARRY CRAWFORD, Administrator of the
WESTERN REGIONAL JAIL,**

      **Defendants.**

**<u>PROPOSED FINDS OF FACT AND RECOMMENDATIONS</u>**

On March 29, 2013, Plaintiff James E. Templeton ("Templeton") filed a complaint in the United States District Court for the Southern District of West Virginia, asserting a cause of action under 42 U.S.C. § 1983. (ECF No. 1). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 2). Currently pending before the Court are the Motion to Dismiss, or in the alternative, Motion for Summary Judgment of Misty Bennett, (ECF No. 17), and the Motion to Dismiss of Larry Crawford. (ECF No. 36). The parties have been given ample time to conduct discovery and file responsive and reply memoranda. In addition, on September 25, 2013, the undersigned conducted a status conference and hearing on the motions. Accordingly, the motions are

1

ready for disposition. For the reasons that follow, the undersigned **FINDS** that Plaintiff fails to state viable claims against the defendants under 42 U.S.C. § 1983 and therefore respectfully **RECOMMENDS** that Plaintiff's complaint be **DISMISSED**, with prejudice, and removed from the docket of the Court.

## I.   <u>Complaint</u>

Templeton, a West Virginia Division of Corrections ("DOC") inmate, was housed temporarily at the Western Regional Jail ("WRJ") in Barboursville, West Virginia from March 19, 2012 through July 26, 2013. (ECF No. 46 at 15-16).[1] On March 29, 2013, Templeton filed the instant action, asserting that he was receiving substandard medical care at the WRJ. In particular, Templeton complained that the defendants refused to provide him with a heel lift or orthopedic shoe to compensate for a 3/4-inch difference between the lengths of his left and right legs. (ECF No. 1 at 4). Templeton alleged that he had necrosis of the right hip joint and had worn a lift in his right shoe since 1985. Upon his admission to the WRJ, Templeton's shoes and lift were confiscated for security reasons. Without the lift, Templeton experienced severe pain in his left knee, lower back, and right hip. In the complaint, Templeton acknowledged that the WRJ's administrator had recently approved his request for a shoe lift, but contended that it had taken too long "to accomplish this small victory." (ECF No. 1 at 9).

In addition, Templeton claimed that the WRJ failed to correctly classify his hip condition as a "chronic care" case. According to Templeton, inmates are not charged for chronic care, but are charged for other medical services. As a result of the Jail's mistake, Templeton was charged $5.00 for every medical visit regarding his hip and leg pain and

---

[1] At the status conference, Templeton was unsure of the date of his transfer to a DOC facility, although he believed it was at the end of August 2013. However, according to the DOC's inmate locator, Templeton was actually transferred to a DOC facility on July 26, 2013.

$3.00 for every prescription of pain medication. (*Id.* at 8).

Finally, Templeton contended that the WRJ's medical personnel failed to prescribe appropriate medications for his chronic pain. He indicated that prescription-strength pain relievers, such as "Mobic, Tordol, Celebrex, and Bextra," were non-habit forming and non-narcotic and would have better controlled his pain than the Motrin he received. He claimed that the failure to prescribe one of these medications constituted a deliberate and gross disregard of his medical needs. (*Id.* at 9).

For relief, Templeton requested the Court to order an extension of the chronic care guidelines to cover his musculoskeletal disorder, and to sternly reprimand the responsible administrators and companies for their inadequate medical care. He also sought compensatory damages for pain and suffering and reimbursement of the amounts he paid for medical treatment and prescriptions related to his musculoskeletal condition. Finally, Templeton asked that the costs of "all repairs and operations related to [his] hips and knees caused or accelerated by not having the lift" be paid by the defendants. (ECF No. 1 at 5-6).

## II.   <u>Relevant Facts</u>

Shortly after his admission to the WRJ, Templeton was seen by a facility physician and placed on an opiate detoxification protocol and a benzodiazepine withdrawal protocol.[2] (ECF No. 17-3 at 4). He also began receiving treatment at the WRJ's chronic care clinic for ongoing medical conditions, including hypertension and diabetes. (*Id.*).

On March 23, 2012, Templeton advised the medical providers at the WRJ that he

---

[2] Templeton does not dispute the medical chronology supplied by Defendant Bennett. (ECF No. 46 at 19-20). In addition, Templeton's medical records from the WRJ were supplied to the Court for *in camera* review and substantiate the accuracy of Defendant's chronology.

had a leg length discrepancy of 3/4 inch and had previously worn a shoe lift. He stated that he could not wear the lift while incarcerated at the WRJ, so he needed medication to alleviate the resulting pain in his hip and low back. (*Id.* at 4-5). In response to his request, Templeton was prescribed Motrin 400 mg. two times per day. Medical personnel also recommended that Templeton be transferred to a bottom tier cell, but Templeton refused that suggestion, stating, "I'm fine where I am at." (*Id.* at 5).

On April 9, 2012, Templeton was given a prescription for Naprosyn EC 375 mg. two times per day for thirty (30) days to treat his pain. (*Id.*). During the next few months, Templeton asked for refills of his pain medications, which were provided by the Jail's medical providers. (ECF No. 17-3 at 5-6). In September 2012, Templeton began complaining of increased problems with his right hip. (*Id.* at 6-7). Templeton was examined by a physician and diagnosed with sciatica; accordingly, his prescription was increased to Motrin 800 mg twice each day for thirty (30) days. Over the next several months, Templeton was given refills of both Naprosyn and Motrin for pain control. (*Id.* at 7).

On December 14, 2012, Templeton submitted a sick call request indicating that the pain in his hip was worse, and he felt his hip bone might be coming out of the socket. (*Id.* at 8). Templeton saw a nurse on December 16, followed by a visit with a physician on December 17, 2012. At that visit, Templeton advised the physician that he had been scheduled for a hip replacement surgery prior to his incarceration, but did not want the procedure done while he was in custody. (*Id.*). Templeton's hip was x-rayed, and he was prescribed Ibuprofen 600 mg. twice per day for thirty (30) days. The x-ray revealed that Templeton had end-stage avascular necrosis of the right hip, but no hip dislocation. (*Id.* at 9). Templeton continued to receive pain relievers from the medical unit, and on

February 21, 2013, was granted his request to have Osteo Bi-Flex, a joint supplement, added to his medication regimen. (ECF No. 17-3 at 9-10).

On March 5, 2013, Templeton wrote to the Executive Director of the West Virginia Regional Jail and Correctional Facility Authority about an incident involving food service at the WRJ. In that letter, he also complained that he had been denied a shoe lift despite his leg length discrepancy. He asked for stronger pain medication and disputed the charges related to the care of his hip and back, arguing they were chronic conditions that should be treated without charge in the chronic care clinic. (*Id.* at 10). Approximately two weeks later, Templeton received a written response from Ronald B. Casto, Interim Administrator at the WRJ. Mr. Casto advised Templeton that the WRJ had no documentation reflecting the presence of a shoe lift in Templeton's possessions at the time of his admission.[3] Mr. Casto suggested that Templeton supply the medical department with the name of the physician who prescribed the shoe lift and, once the medical necessity of the lift was established, Mr. Casto would authorize its purchase. (ECF No. 17-3 at 11).

In April 2013, Erin Lewis, administrator of the WRJ's medical unit, requested records from Templeton's orthopedic surgeon to follow-up on the prescription for a heel lift. (*Id.*). A second request for information was made on May 2, 2013. (*Id.* at 12). A third request was sent on May 7, 2013, followed by a telephone call to the orthopedist's office. (*Id.* at 13). The orthopedist's staff reported that Templeton was last seen in 2009 for a hip injury, but denied having any record of a prescription for a heel lift. The WRJ finally received a copy of Templeton's medical records from the orthopedist on May 23, 2013.

---

[3] Apparently, the lift became lodged in the toe of Templeton's right shoe, and his personal property, including his shoes, had been released to his mother. (ECF No. 46 at 15, 41-42).

The records documented that Templeton's right leg was shorter than his left leg, but as indicated, did not include a prescription for a shoe lift. (*Id.* at 14).

On July 9, 2013, Templeton's chiropractor wrote to the WRJ and opined that a heel lift was medically necessary to treat Templeton's leg length discrepancy and to prevent undue postural stress on the other joints of his lower extremities. (ECF No. 25 at 3). This correspondence was the first evidence supplied by Templeton that a shoe lift was medically necessary. Templeton's medical file reflects that upon receipt of the letter, a physician at the WRJ noted that a heel lift would be ordered for Templeton if acceptable under the WRJ's security requirements. The WRJ's administrator subsequently approved the request, and the medical unit began processing the order for Templeton's heel lift. (ECF No. 46 at 16-17). Unfortunately, Templeton was transferred from the WRJ to a DOC facility before the lift could be provided to him. (*Id.*).

## III.   <u>Standard of Review</u>

Defendants have filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When reviewing the sufficiency of the complaint, the court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Philips v. Pitt County Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009). The court is required to liberally construe *pro se* complaints, such as the

6

one filed in this civil action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). Nonetheless, even under this less stringent standard, the complaint still must contain sufficient factual allegations to support a valid legal cause of action. The court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), develop the plaintiff's legal theories for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

Defendant Misty Bennett has also moved, in the alternative, for summary judgment under Fed.R.Civ.P. 56, arguing that she is entitled to a dismissal of the complaint against her as a matter of law. Summary judgment should be granted if the movant shows, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. The party moving for summary judgment has the initial burden of showing that no genuine issue of material fact is present. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). A "material fact" is a fact that might affect the outcome of a party's case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Id.* In addition, only *genuine* disputes over material facts "will properly

preclude the entry of summary judgment." *Id.*; *JKC Holding Co. v. Wash. Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cnty. of Prince William,* 249 F.3d 295, 299 (4th Cir.2001) (*citing Anderson,* 477 U.S. at 248).

Once the moving party has met its burden, the non-moving party must affirmatively respond with specific evidence "showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985) (*citing Barwick v. Celotex Corporation,* 736 F.2d 946, 963 (4th Cir. 1984). Instead, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256.

When considering a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. In making this determination, the court will view the evidence in the light most favorable to the non-moving party and draw from it all permissible inferences in that party's favor. *Diebold, Inc.,* 369 U.S. at 655; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587−88.

## IV.   **Discussion**

As indicated below, regardless of which standard of review is applied, Templeton's complaint fails to state a claim against the defendants under § 1983 and should be dismissed.

8

### A.  Larry Crawford

Defendant Crawford has moved for dismissal under Fed.R.Civ.P 12(b)(6); therefore, the Court must determine the sufficiency of the complaint against Crawford, when accepting as true the well-pleaded allegations and viewing them in the light most favorable to Templeton. Defendant Crawford argues that Templeton's complaint must be dismissed because it seeks money damages from Crawford in his official capacity as Administrator of the WRJ.

The Eleventh Amendment to the United States Constitution provides "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. art. XI. The sovereign immunity created in this article protects both the State itself and its agencies, divisions, departments, officials, and other "arms of the State." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *see also Regents of the Univ. of California v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1977) ("[I]t has long been settled that the reference [in the Eleventh Amendment] to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities"). Thus, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will,* 491 U.S. at 71. The United States Supreme Court explained in *Will,* "[o]bviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Id.* The Court later clarified its holding, making a distinction between

9

officials acting in their official capacities and officials acting in their personal capacities under color of state law. *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The former are immune from prosecution for money damages under § 1983, while the latter are not. The Court explained that because the real party in interest in an "official-capacity" suit is the governmental entity, rather than the named official, the target of such a claim is the entity's "policy or custom." *Hafer*, 502 U.S. at 25. "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." *Id.* Therefore, if the claim against Defendant Crawford is an "official-capacity" claim, he will enjoy the same immunity from money damages as the State of West Virginia. If the claim is a "personal-capacity" claim, Crawford will not be afforded the same protection, although he "may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Id.*

The determination of whether a defendant has been named in his official or personal capacity is generally made by examining the face of the complaint. *Amos v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 126 F.3d 589, 609 (4th Cir. 1997), *vacated on other grounds by* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998). Nevertheless, "a plaintiff need not plead expressly the capacity in which he is suing a defendant in order to state a cause of action under § 1983 ... when a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Biggs v. Meadows*, 66 F.3d 56, 60-61 (4th Cir. 1995). Ultimately, "the underlying inquiry remains whether the [p]laintiff's intention to hold a defendant personally liable can be ascertained fairly." *Biggs*, 66 F.3d at 61.

In this case, Templeton does not explicitly state in the complaint the capacity in which he sues Crawford; however, the substantive nature of the complaint, as well as Templeton's motion to amend the complaint to add Crawford when he replaced Ronald Casto as Administrator of the WRJ, indicate that Templeton intended to sue Crawford in his official capacity. Moreover, Templeton admitted at the status conference that Crawford was substituted as a defendant simply because of his title, and not because of any action or inaction on his part. (ECF No. 46 at 27, 35). Templeton further acknowledged that Crawford was not involved in the matter until "the end of the game," and, like Casto, actually tried to assist Templeton in resolving his concerns. (*Id.* at 35-36). Consequently, the undersigned **FINDS** that Templeton's claim for money damages against Defendant Crawford should be dismissed.

Immunity from money damages, however, does not end the analysis of the complaint against Defendant Crawford. The Supreme Court has carved out a limited exception to Eleventh Amendment immunity, which allows claims against State officials for the purpose of enjoining violations of federal law. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Under the *Ex Parte Young* exception, a federal court may "issue prospective injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for purposes of the Eleventh Amendment." *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010). "[T]he *Ex Parte Young* exception is directed at 'officers of the state [who] are clothed with some duty in regard to the enforcement of the laws of the state, *and* who threaten and are about to commence proceedings'" to enforce an unconstitutional act against affected parties. *Id.* (*citing Ex Parte Young*, 209 U.S. at 155-156). The state officer being sued must have "proximity to and responsibility for the challenged state action" before

the exception can be invoked. *Id.* Here, Templeton asks the Court to order the WRJ to extend its current policy to include his hip condition as a chronic care case. Assuming for the purposes of discussion that such a claim is actionable under § 1983 and falls within the *Ex Parte Young* exception, the claim must still be dismissed on the ground that it is moot.

"To be justiciable under Article III of the Constitution, the conflict between the litigants must present a 'case or controversy' both at the time the lawsuit is filed and at the time it is decided. If intervening factual ... events effectively dispel the case or controversy during pendency of the suit, the federal courts are powerless to decide the questions presented." *Ross v. Reed,* 719 F.2d 689, 69-94 (4th Cir. 1983). "The requisite personal interest that must exist at the commencement of the litigation ... must continue throughout its existence. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68 n.22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

"[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." *Rendelman v. Rouse,* 569 F.3d 182, 186 (4th Cir. 2009). "The reasons for finding mootness in such a context are clear. Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim." *Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir. 2007). Moreover, "[a]ny declaratory or injunctive relief ordered in the inmate's favor in such situations would

have no practical impact on the inmate's rights and would not redress in any way the injury he originally asserted." *Id.*

Nevertheless, a plaintiff's claim should not be dismissed as moot if there is sufficient evidence to conclude that the action is "capable of repetition, yet evading review." *Federal Election Commission v. Wis. Right to Life*, 551 U.S. 449, 462, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). The exception is limited to exceptional circumstances. *See Incumaa*, 507 F.3d at 289. In the absence of a class action, the 'capable of repetition, yet evading review' doctrine is limited to the situation where two elements combined: (1) the challenged action was "in its duration too short to be fully litigated prior to its cessation or expiration," and (2) there was "a reasonable expectation that the same complaining party would be subjected to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

The burden on a prisoner to establish post-transfer viability of such a claim is heavy. The plaintiff must make a reasonable showing "that he will again be subject to the alleged illegality." *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). In *Higgason*, an inmate alleged that his claim for injunctive relief made pursuant to a § 1983 claim should not be dismissed as moot, even though he was no longer at the facility about which he complained, because his return to that facility was a "virtual certainty." *Id.* The court rejected this contention as a basis for applying the exception, stating, "[s]uch an allegation does not amount to a 'showing' or a 'demonstration' of the likelihood of retransfer." *Id.* Mere conjecture that a plaintiff may return to a prison facility and again face the alleged wrong is not sufficient to meet the mootness exception. *Id.*

Applying these standards, the undersigned **FINDS** that Templeton's request for prospective relief should be dismissed. Templeton was housed at the WRJ until a cell in a DOC facility became available. He was transferred to a DOC site in July 2013. Consequently, Templeton is no longer subject to the policies and procedures of the WRJ or the West Virginia Regional Jail and Correctional Facility Authority. Templeton has not established a "reasonable expectation" or a "demonstrated probability" that he will return to the WRJ or any other Regional Jail. Therefore, the requested prospective relief would have no practical impact on Templeton's rights, nor redress in any way his alleged injuries. Thus, Defendant Crawford's motion to dismiss, (ECF No. 36), should be granted.

### B.  *Misty Bennett and Prime Care Medical, Inc.*

The undersigned considers Defendant Bennett's dispositive motion as a motion for summary judgment under Fed.R.Civ.P. 56. Consequently, the Court must view the evidence in the light most favorable to Templeton, draw from it all permissible inferences in his favor, and determine whether there are genuine issues for trial. If no genuine issues of material fact exist, and Defendant Bennett is entitled to judgment as a matter of law, the complaint must be dismissed against her.

Defendant Bennett argues that Templeton's claims should be dismissed against her for several reasons. First, she asserts that Templeton fails to allege facts regarding his medical care that rise to the level of Eighth Amendment violations. Instead, she contends that, at most, Templeton alleges medical negligence, which is a claim governed by West Virginia's Medical Professional Liability Act ("MPLA"), and not by federal constitutional law. According to Bennett, Templeton failed to comply with mandatory pre-suit requirements set forth in the MPLA; therefore, his complaint must be

dismissed. Next, Defendant Bennett claims that she is entitled to qualified immunity because her actions did not violate any clearly established constitutional right of Templeton. Finally, she argues that Templeton failed to exhaust available administrative remedies before filing his complaint, and regardless of the type of relief sought, administrative exhaustion is mandatory under the Prison Litigation Reform Act of 1995. For these reasons, Bennett asks that the complaint be dismissed.

After examining the record, the undersigned **FINDS** that no genuine issues of material fact exist. Templeton does not dispute that he received the medical treatment documented in the record, nor does he contest the authenticity of the grievance forms supplied by the WRJ. Having thoroughly reviewed the evidence, the undersigned agrees with Defendant Bennett that Templeton's allegations regarding the medical care he received at the WRJ simply do not rise to the level of Eighth Amendment violations. For that reason, his complaint against Misty Bennett, and any other prison official charged with his medical treatment, should be summarily dismissed.

The Eighth Amendment to the United States Constitution requires the State to provide its prison inmates with basic medical care. *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A prison official violates this constitutional guarantee when he responds to a prisoner's serious medical need with deliberate indifference. *Estelle,* 429 U.S. at 104; *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Therefore, to state a cognizable Eighth Amendment claim, an inmate must meet two prongs, one objective and one subjective. First, the inmate must demonstrate the existence of a medical condition or need that is objectively serious. *Estelle,* 429 U.S. at 104. A medical condition is serious under the Eighth Amendment when it has been diagnosed by a physician as mandating treatment, or is so

obvious that even a lay person would understand that medical attention is necessary. *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 208 (1st Cir. 1990). A serious medical need may also be shown by the presence of a medical condition that significantly affects the prisoner's daily activities or causes chronic and substantial pain. *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir. 1992); *see, also. Adams v. Southwest Virginia Regional Jail Authority,* 524 Fed.Appx. 899, 900-01 (4th Cir. 2013). Second, the inmate must show that the defendant subjectively responded with deliberate indifference to the inmate's serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 2323–2325, 115 L.Ed.2d 271 (1991). "[D]eliberate indifference entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer,* 511 U.S. at 835.

Templeton asserts that his leg length discrepancy constitutes a serious medical condition under the objective prong of the Eighth Amendment analysis. He further claims that the defendants acted with deliberate indifference to his serious medical need by not providing him with a shoe lift and by not prescribing stronger pain medication. The evidence of record demonstrates that Templeton made repeated complaints to the WRJ's medical unit of chronic and significant pain and disability. Nonetheless, it is unclear whether his complaints were truly the consequence of walking without a shoe lift, or were more likely the product of his underlying medical condition of end-stage avascular necrosis of the right hip joint. The distinction makes a difference here given that Templeton's complaint is based upon the WRJ's failure to supply a shoe lift, not on its treatment of avascular necrosis. End-stage avascular necrosis of the hip joint can cause severe pain, and when left untreated, may result in osteoarthritis, a dislocated

joint, and a broken hip bone. Clearly, these are serious medical conditions. At the end-stage, avascular necrosis usually requires surgical replacement of the hip.[4]

On the other hand, the physical impact of a 3/4-inch leg length discrepancy is not so readily discernible. Indeed, other courts addressing the same medical condition have concluded that a leg length disparity is not a sufficiently serious medical condition to support a claim under the Eighth Amendment. *See Shakur v. Furey,* No. 3:08-cv-1187 (VLB), 2010 WL 1416836, at *4 (D.Conn. Apr. 8, 2010) (plaintiff failed to show through case law or medical opinion that a 3/8-inch leg length difference constituted a serious medical need); *Graham v. Aponte,* No. 1:08-cv-308(LMB/JFA), 2009 WL 249779, at *4 (E.D.Va. Feb. 2, 2009) ("[T]he discrepancy in the length of plaintiff's legs which requires a 3/8-inch lift in one shoe is not a sufficiently serious medical need or condition to satisfy the objective component of an Eighth Amendment claim."); *Turner v. Solorzano,* No. 3:04–cv–632–J–32MMH, 2006 WL 2523410, at *3 (M.D.Fla. Aug.30, 2006) (finding that a 3/8-inch disparity in length of inmate's legs was not serious medical need), *aff'd,* 228 Fed. Appx. 922, 923–24 (11th Cir.2007); *Haverty v. Crosby,* No. 1:05–cv–00133–MP–EMT, 2006 WL 839157, at *5 (N.D.Fla. Mar.28, 2006) (finding that a 3/4-inch difference in the length of the plaintiff's legs "does not rise to the level of a serious medical need"). In view of his end-stage avascular necrosis, Templeton will likely continue to suffer significant hip pain, joint deterioration, and difficulty ambulating until he undergoes hip replacement surgery. Thus, the serious medical need in this case appears to be surgery, the definitive treatment for Templeton's end-stage avascular necrosis; not replacement of a shoe lift for a minimal leg length disparity.

---

[4] National Institute of Arthritis and Musculoskeletal and Skin Diseases. NIH Publication No. 09–4857, www.niams.nih.gov/Health_Info/Osteonecrosis

However, assuming for the sake of argument that Templeton can establish a serious medical need caused by the 3/4-inch discrepancy between his right and left leg lengths, he still cannot show deliberate indifference on the part of any prison official in addressing that need. Deliberate indifference presumes that the prison official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. A prison official is not liable under the Eighth Amendment if a reasonable response is made, "even if the harm ultimately [is] not averted." *Odom v. South Carolina DOC,* 349 F.3d 765, 770 (4th Cir. 2003) (*citing Farmer,* 511 U.S. at 844). Moreover, medical negligence is not the equivalent of a constitutional violation. *Estelle,* 429 U.S. at 106; *Russell v. Sheffer,* 528 F.2d 318, 319 (4th Cir. 1975). To establish that a prison official's actions constitute deliberate indifference to a serious medical need, "the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir. 1990).

In this case, Templeton initially complained about pain in his hip and lower back. At that time, he did not ask for a shoe lift, and there is no evidence to suggest that the defendants knew or appreciated that the lack of a shoe lift would pose an excessive risk to Templeton's health or safety.[5]  Instead, Templeton requested only pain medication. Therefore, the WRJ's medical staff responded by providing Templeton with pain relievers. When his symptoms worsened, the medical staff increased the dosage of

---

[5] The records supplied for *in camera* review document that the first sick call request from Templeton regarding his hip and lower back was dated March 23, 2012 and stated the following: "Pain in rt. hip & lower back. Have shoe lift for shorter leg cannot wear in here need some type of painkiller anything please." The following date, he was prescribed Motrin 400 mg. twice per day as needed.

Templeton's medication and also tried different types of pain relievers to determine which worked best at relieving his symptoms. Templeton complains that he was not given the medication that he wanted, but the Eighth Amendment does not guarantee a prisoner his choice of treatment. *Jackson v. Fair,* 846 F.2d 811, 817 (1st Cir. 1988) (*citing Layne v. Vinzant,* 657 F.2d 468, 471 (1st Cir.1981)). A mere disagreement between the inmate and the prison official over the type or extent of medical care rendered to the inmate does not state a cause of action under the Eighth Amendment. *See Smart v. Villar,* 547 F.2d 112, 114 (10th Cir. 1976). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." *Malcomb v. Raja,* No. 2:09–cv–0647, 2010 WL 3812354, at *1–2 (S.D.W.Va. Sept.22, 2010) (*citing Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir. 1977) (finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation.").

In December 2012, when Templeton complained of feeling his hip bone out-of-socket, the providers x-rayed his hip. As the hip was not out-of-place, Templeton was given additional pain medication. At that time, Templeton reported his history of avascular necrosis and advised the medical staff that he needed a hip replacement surgery. Nevertheless, Templeton made it crystal clear that he intended to wait until his release from custody before obtaining the procedure. Therefore, the definitive treatment for pain and disability related to avascular necrosis was not an option available to the medical staff. Considering the limitations imposed by Templeton, the staff did its best to address his complaints. When Templeton asked that the joint supplement, Osteo Bi-Flex, be added to his medication regimen, jail officials allowed Templeton's mother to

supply it to the medical unit, and it was given to Templeton even though Osteo Bi-Flex was not on the Jail's formulary. Moreover, when Templeton made the first request for a replacement shoe lift in March 2013, the WRJ and its medical staff took reasonable steps to respond to that request. Templeton did not establish the medical necessity of the shoe lift until July 2013 when his chiropractor wrote a letter confirming the need. (ECF No. 46 at 18, 44). Shortly thereafter, the WRJ approved the purchase of a shoe with a lift, and Templeton would have received it if not for his transfer. Contrary to Templeton's contentions, the medical records and grievance forms reflect prompt and reasonable responses by the WRJ and its medical staff to address Templeton's needs despite restrictions connected with his history of drug abuse, his incarceration, and his decision to delay necessary hip replacement surgery. Accordingly, the undersigned **FINDS** that Templeton plainly fails to demonstrate deliberate indifference to his medical needs by prison officials. Thus, Defendant Bennett's motion for summary judgment, (ECF NO. 17), should be granted.

### C. Failure to Exhaust Administrative Remedies

Templeton's final claim is that the WRJ violated his constitutional rights by forcing him to pay for the cost of medical services provided for hip and back pain. According to Templeton, his necrotic hip clearly qualified as a chronic medical condition. Consequently, he should have received free services in the chronic care clinic, rather than being charged for each medical visit and each prescription. Templeton does not specifically tie this claim to either defendant, and it is more properly asserted against the official at the West Virginia Regional Jail and Correctional Facility Authority responsible for establishing and implementing policies related to inmate co-pays for medical services. However, rather than recommending dismissal of the claim on that

basis, the undersigned **FINDS** that Templeton's failure to exhaust administrative remedies is a more substantive reason for dismissal.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)(1996), requires inmates to exhaust available administrative remedies before filing a civil action over prison conditions. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2382–83, 165 L.Ed.2d 368 (2006). In this case, Templeton was expected to follow the grievance procedure outlined by The West Virginia Regional Jail and Correctional Facility in the Handbook of Inmate Rules and Procedures. According to the Handbook, an inmate initiates the grievance procedure by filing an inmate grievance form with the administrator of the facility. If dissatisfied with the administrator's response to the grievance, the next step requires the inmate to file an appeal with the Regional Jail Authority's Chief of Operations. This appeal must be filed within five days of receipt of the administrator's decision and must include a copy of both the initial complaint and the administrator's response. If the Chief of Operations does not satisfactorily resolve the grievance, the inmate may take the final step in the procedure by requesting, within five days of receipt of the response, a review by the Office of the Executive Director. Administrative remedies are not exhausted until all three steps have been taken.

According to the affidavit of Steven Crook, Chief of Operations for the West Virginia Regional Jail and Correctional Facility Authority, Templeton did not follow the inmate grievance procedure despite having been given the Handbook of Inmate Rules and Procedures. (ECF No. 17-4 at 2-4). Instead, the first time Templeton formally raised the concern about medical charges was on March 5, 2013 in a letter addressed to the Executive Director of the Regional Jail Authority. He sent this correspondence without first filing a grievance form at the level of the facility administrator or proceeding in

order through the designated levels of appeal. When Templeton was directed to start the process over in accordance with the Handbook's instructions, he failed to complete all three steps in the administrative process. (*Id.*). Instead, on March 29, 2013, he filed the instant civil action. At the status conference, Templeton was vague about his compliance with the three-step procedure. However, the documents suggest that Templeton abandoned the grievance procedure in favor of the complaint filed herein.

It should be noted that to the extent Templeton complains only about being charged for medical care, his complaint fails to state a claim under § 1983. A State's decision to charge an inmate a co-pay for medical treatment is a matter of state law, which generally is not actionable under § 1983 unless the inmate is denied necessary medical treatment due to an inability to pay. *See City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 245, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). Consequently, administrative exhaustion in this context is irrelevant.

However, to the extent Templeton's complaint is more wide-ranging, the claim may be actionable under § 1983, but still must be dismissed for failure to exhaust administrative remedies. The evidence unequivocally demonstrates that Templeton did not complete all three steps of the grievance procedure in the proper order and using the correct forms. As stated, Templeton first raised the concern in his March 5, 2013 letter to the Executive Director, which was forwarded to the WRJ's administrator to handle. The administrator responded directly to Templeton, meeting with him and assuring him in writing that the matter would be referred to the facility's medical director to explain the reason that Templeton's hip condition was excluded as a chronic care case. Templeton made no further attempt to resolve the grievance prior to filing the instant

action. (ECF No. 17-4 at 4). Therefore, the undersigned **FINDS** that Templeton has failed to exhaust his administrative remedies, and this claim must also be dismissed.

## V.    <u>Proposal and Recommendations</u>

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the United States District Judge accept and adopt the findings herein and **RECOMMENDS** that:

1.    The Motion to Dismiss, or in the alternative, Motion for Summary Judgment of Misty Bennett, (ECF No. 17), be **GRANTED;**

2.    The Motion to Dismiss of Larry Crawford, (ECF No. 36), be **GRANTED**;

3.    Plaintiff's complaint be **DISMISSED, with prejudice**; and

4.    This action be removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S.

140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff, Defendants, counsel of record, and any unrepresented party.

**FILED:**  December 27, 2013.

Cheryl A. Eifert
United States Magistrate Judge

.